IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| LUCY MARTINEZ HARKIN, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | 7:11-CV-138-O-KA |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant | § | |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

By Order Referring Case (Docket No. 5) this case was referred to the undersigned United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b) and Rule 72 of the Federal Rules of Civil Procedure for hearing, if necessary, and recommendation or determination.

### Factual and Procedural Background[1]

This is a Social Security appeal whereby Plaintiff Lucy Martinez Harkin seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Harkin alleges that she is disabled as a result of a disabling condition, called peripheral neuropathy. On October 6, 2009 when her application was filed, Lucy Harkin was a married woman of 49 years with a 9th grade education who had formerly worked in food service, most recently as a cook. During the determination process she turned 50. In her application for disability income ("DI") benefits, she listed her impairment as "peripheral neuropathy" which

---

[1] The following background comes from the transcript of the administrative proceedings which is designated as "Tr." in the citations and footnotes and from agreed statements in the parties' briefs.

1

caused her feet to swell so that she could only stay on her feet for about 3 hours at a time, caused pain at night that gave her sleeping problems and caused her to limp. She claimed that this condition caused her to reduce her work hours as a cook in the kitchen of a Sonic Drive-in from 7 to 8 hours to no more than 4 hours per day. After her application was denied initially and on reconsideration, on April 7, 2010 Plaintiff requested a hearing before an administrative law judge (ALJ). That hearing was held on December 15, 2010. Thereafter on April 5, 2011 the ALJ issued his decision denying her disability claim. On appeal the Appeals Council likewise denied her claim. From that final denial she timely perfected her appeal to this court.

The Decision Making Process

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.,* and disability income benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the Social Security Act (SSA). Although technically governed by different statutes and regulations, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994)." In addition, numerous regulatory provisions govern disability insurance. *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416(SSI).

"The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C.§§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel,* 168 .3d 152, 154 (5th Cir.1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of

2

impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler,* 752 F.2d 1099, 1101 (5th Cir.1985), *cited in Loza v. Apfel,* 219 F.3d 378, 392 (5th Cir.2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197–98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id."*[2]

## The Decision

In this case at Step One in the five step sequential disability evaluative process,[3] the ALJ determined that Harkin had not engaged in substantial gainful activity since the alleged on-set date of September 15, 2009.[4] Proceeding to Step Two in the process, the ALJ determined that Harkin had a combination of "severe" impairments: arthritis; hypertension; and peripheral neuropathy. which cause significant vocationally relevant limitations. But at Step Three the ALJ determined that neither alone or in combination did these two impairments meet the "Listed

---

[2] From *Seibert v. Astrue*, 2010 WL 6389303, CA 4:09-CV-90-A (J. Cureton, N.D. Tex. 2010).

[3] The process succinctly and accurately summarized and annotated in the article by Magistrate Judge Morton Denlow and titled *"Substantial Evidence Review in Social Security Cases as an Issue of Fact,"* 2007 Fed. Cts. L. Rev. 3, 4-5 (2007)..

[4] ALJ's Decision, Tr.13.

Impairments."[5]  This necessitated that in this Step Four of the evaluative process the ALJ conduct an analysis of the effects of these impairments upon Harkin's capacity to perform meaningful work, that is, to determine Harkin's residual functional capacity ("RFC").  In making his determination of her RFC at this Step Four, the ALJ found that she had certain "non-exertional" functional limitations,[6] but even with those limitations she could perform "light work." Although he found that she was unable to perform any of her "past relevant work," she could perform other forms of "light work" available in the national economy.  It is the ALJ's RFC determination at Step Four that Harkin challenges in this appeal.

Plaintiff's Argument

In the light of Harkin's age change during the administrative processing of her claim,  the regulatory distinction between "light work" and "sedentary work" became critical to her entitlement to benefits. As the ALJ noted in his decision, at the time of her September 15, 2009 alleged on-set date she was only 49 years of age which under the applicable regulations categorized  her as a "younger individual." A little over a month later on October 26, 2009 she turned 50 which moved her into another age category as an "individual closely approaching advanced age."[7] Harkin observes that if she had been limited to only "sedentary work," she would have met Grid listing 201.09 as of her 50th birthday.  Listing 201.09 states that if a person who is "closely approaching advanced age" has a limited education and has no transferable skills from previous work, then that person is disabled and entitled to disability benefits. Having found that

---

[5]     *Id*. at 17.

[6]     "...considering the generalized body aches and claimant's alleged fatigue, the claimant can: occasionally climb ramps and stairs, balance, and stoop; never kneel, crouch, crawl, and climb ropes, ladders, or scaffolds; be able to sit or stand at will; avoid exposure to temperatures of 80 degrees or more or 65 degrees or less; no work overhead; and frequently, but not constantly, use the upper extremities for reaching, handling, and fingering." *Id*. at 17.

[7]     *Id.* at 19.

Harkin was a person of limited education and had no transferable skills,[8] the ALJ's RFC determination of the nature of the work Harkin <u>could</u> perform, given the effects of her impairment, was critical to his final decision finding that Harkin was not disabled.

Focusing then, upon the ALJ's RFC analysis, Harkin posits that the regulatory definitions of "sedentary work" and "light work" contain a primal distinction based on a standing/walking work requirement. Social Security Regulation §404.1567 (a) and (b) provide as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, *a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required <u>occasionally</u>* and other sedentary criteria are met.
>
> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it *requires a <u>good deal</u> of walking or standing*, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. (Emphasis supplied)

These definitions are further elaborated by Social Security Ruling 83-10 which provides in pertinent part as follows:

> The following elaborations of the activities *needed* to carry out the requirements of sedentary, light, and medium work are based on the same resource materials noted in section 200.00(b) of Appendix 2. They may be used by decision makers to determine if an individual has the ability to perform the full range of sedentary, light, or medium work from an exertional standpoint.
>
> 1. *Sedentary work*. The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a

---

[8]   *Id.* Findings 8 and 9.

> certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary *if walking and standing are required <u>occasionally</u>* and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
> "*Occasionally*" means occurring from very little up to one-third of the time. *Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday,* and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.
>  2. *Light work*. The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, *a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs.* A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.
>  "*Frequent*" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, *the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.* Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work. (Emphasis supplied)

Thus, Harkin concludes that she established that her peripheral neuropathy impairment precluded her from standing or walking for a total of 6 hours of an 8 hour workday so that she could not perform "light work," only "sedentary work," which, because of her age and limited education, rendered her disabled.

The term "peripheral neuropathy" describes damage to the peripheral nervous system, the network that transmits information from the brain and spinal cord to every other part of the body.

Peripheral nerves send sensory information back to the brain and spinal cord, such as a message that the feet are cold or a finger is burned. Because every peripheral nerve has a highly specialized function in a specific part of the body, a wide array of symptoms can occur when nerves are damaged. Some people may experience temporary numbness, tingling, and pricking sensations (parenthesis), sensitivity to touch, or muscle weakness. Others may suffer more extreme symptoms, including burning pain (especially at night), muscle wasting, paralysis, or organ or gland dysfunction.  In the most extreme cases, breathing may become difficult or organ failure may occur. Some forms of neuropathy involve damage to only one nerve and are called mononeuropathies. More often though, multiple nerves affecting all limbs are affected-called polyneuropathy. In the most common forms of polyneuropathy, the nerve fibers (individual cells that make up the nerve) most distant from the brain and the spinal cord malfunction first. Pain and other symptoms often appear symmetrically, for example, in both feet followed by a gradual progression up both legs. Next, the fingers, hands, and arms may become affected, and symptoms can progress into the central part of the body. Many people with diabetic neuropathy experience this pattern of ascending nerve damage.[9]

    The main symptom of peripheral neuropathy is pain in one's extremities, including one's legs and feet.  The ALJ recognized that he had the responsibility to "evaluate the intensity, persistance, and limiting effects of the claimant's symptoms to the extent to which they limit the claimant's functioning."  Simply stated, he had to determine how much it hurt.

    The cause (etiology) of Harkin's peripheral neuropathy is not reflected in the medical diagnoses in the record.  And the magnitude of the effect of the peripheral neuropathy on Harkin is also not shown in the medical reports. So how much did it hurt?  Harkin claims it hurts so bad

---

[9]    Excerpts from Peripheral Neuropathy Fact Sheet of National Institute of Neurological Disorders and Studies, National Institute of Health Publication No. 04-4853.

that she cannot stand or walk for 6 hours in an 8 hour day. The only evidence in the record supporting Plaintiff's claim is her own assertions on her disability forms and her own testimony in the hearing before the ALJ. While the medical reports in the record fully support the peripheral neuropathy diagnosis and the conclusion that the condition causes pain, the record contains no medical correlation between that diagnosis and the effect on Plaintiff's standing/walking ability. On the one hand, if another person of Harkin's sensibilities would endure some certain amount of pain to continue standing or walking so as to perform the requisites of a "light work" job, then that person can perform work that would meet the "light work" standard. On the other hand, if the pain is so much that the same person would not be willing to undergo that pain while standing or walking for 6 hours in an 8 hour day, then one could say that the person cannot perform work that meets the "light work" standard. So the ALJ had to make that determination.

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1529 (c)(4). Although severe pain can constitute a non-exertional impairment, pain is a disabling condition only when it is constant, unremitting and wholly unresponsive to therapeutic treatment. *Johnson v. Sullivan*, 894 F.2d 683, 685 (5th Cir. 1990).

While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983). The ALJ's decision on the severity of pain is entitled to considerable judicial deference. *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987).

Such a credibility determination is within the province of the ALJ. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 128-29 (5th Cir. 1991). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

"The ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. See *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991) (citation omitted)). The subjective testimony of Plaintiff must be weighed against the objective evidence of medical diagnosis. *Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 621 n.4 (5th Cir. 1983)). Subjective evidence need not take precedence over objective evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (citing *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir 1988)). Moreover, a factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. *Villa*, 895 F.2d at 1024 (citing *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987). The ALJ's credibility determination is supported by substantial evidence in the record.[10]

The ALJ had before him the complete medical record. As required by the regulations, in his decision the AlJ made a careful summary of the medical reports-reporting only the objective findings and diagnoses by the medical professionals. I find that his summaries of the content of the medical reports is accurate. He did not find objective evidence in the medical records and reports that P's peripheral neuropathy, though causing chronic pain, physically prevented her from standing or walking for 6 hours in an 8 hour day. He did analyze Harkin's own statements

---

[10]   Hesler v. Astrue, 2012 U.S. Dist. LEXIS 118137 (N. D. Tex. August 21, 2012, MJ Frost)

about her symptoms, the intensity of those symptoms, and the limitations caused by those symptoms, but found her testimony to be not credible. And as required by the regulations the ALJ incorporated into his decision not only his analysis of the medical reports but also his analysis of the P's credibility. Having reviewed the entire medical record, Harkin's own submissions and her testimony at the hearing, I find that there is no medical evidence conclusively establishing that Harkin's pain is so great as to prevent her from standing or walking 6 hours in an 8 hour work day. None of the medical evidence compels a conclusion that the chronic pain Harkin experienced in her limbs from the peripheral neuropathy was of such intensity as to prevent her from standing or walking 6 hours in an 8 hour work day. The objective data in the medical reports does not compel that degree of limitation. The ALJ says that the medical reports show no objective limitation of movement of her legs or feet or arms. He just didn't believe Harkin as to how much it hurts. He thinks she exaggerated her symptoms. There is nothing contrary in the record. I find that the ALJ's RFC determination is adequately supported in the record.

As a stopgap and referring to her hearing testimony,[11] Harkin argues that the peripheral neuropathy manifested itself in numbing of her hands causing her to drop things and limiting her time using a computer. The ALJ found no support for this complaint in the medical record and determined that her testimony overstated her limitations, in the absence of the objective findings concerning her hands on physical examinations.

Bearing in mind the obligation to accord the ALJ due deference to his findings and not to second guess those findings if they are supported by substantial evidence. I find that in determining Harkin's residual functional limitations (RFC) and applying the non-exertional

---

[11]    Tr. 34-35.

limitations as exceptions, the ALJ applied the proper legal standards. I further find that substantial evidence supports his conclusion that Harkin could perform "light work" thus modified by the non-exertional limitations found by the ALJ. I find that the ALJ's determination and decision is supported by substantial evidence. Accordingly, I recommend that Plaintiff's appeal be denied.

It is so ORDERED, this 25 th day of September, 2012.

_____
Robert K. Roach
UNITED STATES MAGISTRATE JUDGE

NOTICE

Standard Instruction to Litigants

A copy of this report containing findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of this order, report, findings and recommendations must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).